UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: Case No. A09-00278-DMD<br><br>YONG H. PIENING,<br><br>     Debtor. | Chapter 7<br><br>**Filed On<br>11/8/10** |
| ALASKA ELECTRIC AND CONTROL, INC.,<br><br>     Plaintiff,<br><br>     v.<br><br>YONG H. PIENING, fdba Gold Miners Hotel,<br><br>     Defendant. | Adversary No. A09-90022-DMD |

## MEMORANDUM DECISION

This is an action for exception to discharge for fraud. This court has jurisdiction over the matter pursuant to 11 U.S.C. §157(b)(2)(I) and the district court's order of reference. I find for the plaintiff.

Background

The debtor, Yong Piening, is a realtor. She immigrated to this country in 1982 from South Korea. In 2006, Ms. Piening became interested in purchasing a business called the Gold Miner's Hotel in Palmer. The business is located in an older structure and includes

a hotel, bar and restaurant. The structure had certain grandfather rights which excused it from compliance with current fire and safety code requirements.

Piening had a partner in the purchase of the hotel, Mr. Park. She and Park purchased the Gold Miner's Hotel in May, 2006, through a limited liability company, Y & S, LLC, which was to operate the business. A $200,000.00 down payment was made towards the purchase. Piening and Park each held a 50% interest in business, but Park was to manage its day-to-day operations.

In March of 2007, Piening and Park attempted to partially renovate the hotel, which was quite old. The renovations cost about $400,000.00 and took four months to complete. Piening used a $280,000.00 line of credit to cover part of the renovation costs. She obtained permits for the renovations, but failed to realize that her efforts to improve the structure would terminate its fire and safety grandfather rights. The renovations opened a Pandora's box of costly code upgrades which ultimately resulted in prolonged closure of the hotel and Piening's personal bankruptcy.

While running the hotel, Park constantly came to Piening with demands for cash to pay bills for the hotel. In November of 2007, Park threatened to leave the business unless he was paid more. He left the business in mid-November, 2007, and Piening assumed control. On January 15, 2008, the Alaska Department of Public Safety, Division of Fire and Life Safety, personally served a "Notification of Fire Hazard and Order to Correct" on one

of Piening's employees at the hotel.[1] The notification listed 39 separate violations of the fire code and mandated that the violations be corrected immediately.[2] The notification also stated that the "Gold Miners Restaurant, Hotel and Bar will be closed until all corrections have been completed."[3] Piening did not close the business. Instead, either she or one of her employees contacted Robert Jewell, the owner of the plaintiff, Alaska Electric & Control, Inc. Jewell met with Piening at the Gold Miner's Hotel on January 15, 2008.[4] She agreed to a time and materials contract, with payment for each day's labor and materials to be made on the day after the services were provided.[5]

The very next day, two electricians from Alaska Electric began to work on the project. Someone from the hotel signed the first "Daily Material and Labor Record" issued by Alaska Electric, dated January 16, 2008.[6] The signature is unintelligible. Alaska Electric prepared and submitted similar daily logs for the work it performed at the hotel on January 17 and 18, 2008.[7] These were also signed by someone from the hotel and, again, the signatures are illegible. The fire marshal closed the Gold Miner's Hotel on January 18, 2008,

---

[1] Def.'s Ex. D.

[2] *Id.*

[3] *Id.*

[4] Jewell's testimony conflicted with Piening's. She denied that this meeting occurred. I found Jewell's testimony to be more credible.

[5] Pl.'s Ex. 1, at 3.

[6] Pl.'s Ex. 3, at 1.

[7] *Id.* at 2-4.

3

at 2:00 p.m. All customers and employees of the hotel, as well as the electricians from Alaska Electric, were forced to leave the building. Alaska Electric did no further work on the building after it was closed.

Alaska Electric delivered invoices for its first two days of work to the defendant or her representative at the hotel. Its Invoice No. 410, for labor and materials provided on January 16, 2008, totaled $977.80.[8] Invoice No. 411, dated January 18, 2008, is for labor and materials provided on January 17, 2008, and totaled $2,056.75.[9] The combined total for the two invoices is $3,034.55. Alaska Electric received a check for this sum, dated January 21, 2001, from a First National Bank checking account for "Y & S, LLC dba Gold Miner's Hotel."[10] It was signed by Piening and referenced Invoices 410 and 411. The check bounced.

On January 21, 2008, Alaska Electric submitted its Invoice No. 414, for labor and materials provided on January 18, 2008.[11] The total billed was $3,031.93. It has not been paid.

After the hotel was shut down on January 18, 2008, Piening poured money into it in an attempt to reopen the business. Between February 18 and September 12, 2008, she withdrew a total of $89,000.00 in personal funds from a joint personal bank account she had

---

[8] Pl.'s Ex. 1, at 11.

[9] *Id.*, at 12-13.

[10] *Id.*, at 5-6.

[11] *Id.*, at 14-15.

4

with her husband at the Alaska District Engineers Federal Credit Union.[12] $85,000.00 of these funds appear to have been deposited into another joint personal account held by the Pienings at First National Bank.[13] Additionally, on June 16, 2008, Piening's husband obtained a $13,000.00 cashier's check from the account at Alaska District Engineers Federal Credit Union, payable to First National Bank.[14] It appears this check was deposited into the Piening's joint account at First National Bank the same day.[15] Piening also cashed $34,312.00 in government bonds on April 29, 2008, and placed the funds in the joint personal account at First National Bank.[16]

Piening liquidated other accounts as well. She cashed in a Vanguard account sometime in March of 2008. The gross distribution from the transaction was $108,331.22.[17] She cashed in two IRAs for $202,674.00 in 2008. Presumably, all of these funds were also deposited into the joint personal account at First National Bank. Bank statements from the

---

[12] Def.'s Exs. E, G. None of the checks are made payable to the Gold Miner's Hotel. Some are payable to the debtor, others are payable to First National Bank and one is payable to cash. They are all signed by the debtor's husband.

[13] *See* Def.'s Ex. G. The routing numbers on the checks dated Feb. 16, Mar. 4, Mar. 24 and Jun. 14, 2008, all contain the Pienings' First National Bank account number.

[14] Def.'s Ex. J.

[15] Def.'s Ex. Q, at 1.

[16] Def.'s Exs. K, P.

[17] Def.'s Ex. H.

5

Pienings' joint personal account at First National reflect that a total of $546,762.80 was deposited into the account between March and October of 2008.[18]

Piening has provided copies of checks written on the First National account during this time frame. The checks and her testimony reflect that she transferred some funds to the Gold Miner's Hotel business account and also made direct payments to some of the hotel's creditors.[19] Undoubtedly, the debtor spent hundreds of thousands of dollars renovating the hotel and trying to bring it up to code. It is impossible to verify precisely how much money she invested given the limited documentary evidence she produced, the lack of any expert accounting testimony and her mixing of personal and business expenses in the joint personal accounts at both the Alaska District Engineers Federal Credit Union and First National Bank.

The debtor's efforts were finally rewarded when the hotel briefly reopened on July 7, 2008. However, she had lost her customer base over the prolonged shutdown and lacked the operating capital to keep the doors open. Additionally, state inspectors returned and again shut the business down for brief periods of time. The hotel ultimately closed and the debtor filed for chapter 7 relief in May of 2009.[20] On August 10, 2009, Alaska Electric filed a timely action to except its debt from discharge under 11 U.S.C. § 523(a)(2)(A).

---

[18] Def.'s Exs. N through T.

[19] Copies of the checks are attached to Def.'s Exs. M through T. Many of the copies are illegible.

[20] *See In re Piening*, Main Case No. 09-00278, Ch. 7 Petition, filed May 5, 2009 (Docket No. 1).

6

Analysis

11 U.S.C. § 523(a)(2)(A) excepts from discharge debts for money, property or services which were obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[21]

To establish a claim for fraud, a creditor must show:

> (1) [that] the debtor made the representations;
>
> (2) that at the time he knew they were false;
>
> (3) that he made them with the intention and purpose of deceiving the creditor;
>
> (4) that the creditor relied on such representations;
>
> (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.[22]

A creditor's reliance on the debtor's representations must be justifiable.[23] The plaintiff must prove the elements of its exception to discharge claim by a preponderance of the evidence.[24]

As noted by Collier:

> The failure to perform a mere promise is not sufficient to make a debt nondischargeable, even if there is no excuse for the subsequent

---

[21] 11 U.S.C. § 523(a)(2)(A).

[22] *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh),* 973 F.2d 1454, 1457 (9th Cir. 1992), *citing Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991).

[23] *Field v. Mans*, 516 U.S. 59 (1995).

[24] *Grogan v. Garner,* 498 U.S. 279 (1991).

7

>breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.
>
>A misrepresentation by a debtor of his or her intention to perform contractual duties, however, may be a false representation under section 523(a)(2)(A). Thus, section 523(a)(2)(A) may make a creditor's claim nondischargeable if the debtor had no intention of performing any of the obligations under the contract. This intent may be inferred from the fact that the debtor failed to take any steps to perform under the contract.[25]

The sole basis for Alaska Electric's fraud claim is Piening's oral representation that she would pay Alaska Electric in accordance with the relatively tight terms of the contract. Alaska Electric alleges that the debtor made this representation to Robert Jewell when the parties met on January 15, 2008, and a contract was signed. There was contradictory testimony regarding whether this meeting occurred. Piening denied any meeting occurred, while Jewell testified that one did. Jewell also testified that Piening orally agreed to the terms of payment set forth in the contract and stated that she had the funds to complete the work.

Jewell's testimony was more credible. I find that the parties did meet on January 15, 2008. Piening not only signed a contract with Alaska Electric which specified that she would be billed each day for the preceding day's labor and materials, she also

---

[25] 4 *Collier on Bankruptcy* ¶ 523.08[1][d] at 523-45 - 46 (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2010) (citations omitted).

represented that she had sufficient funds to promptly pay for the services provided by Alaska Electric.

When Piening and Jewell met on January 18, 2008, did Piening know that this representation was false? The evidence strongly suggests that she did. Piening bounced a check to Alaska Electric for $3,045.55 just six days after signing the contract, despite having hundreds of thousands of dollars in liquid assets available for payment. She poured substantial amounts of her own funds into the hotel after it was closed, but never attempted to cover the bounced check written to Alaska Electric. Nor did she attempt to pay the plaintiff's third invoice issued on January 21, 2008. In fact, during the trial, Piening candidly admitted she had decided not to pay "little" creditors like Alaska Electric until after she had reopened the business. Even after the hotel reopened, however, she did not pay Alaska Electric.

I conclude that Piening knew at the time of the representation that her statement regarding prompt payment was false. I further conclude that she made her representation with the intent and purpose of deceiving the plaintiff. Her promise to pay was not in the remote future; it was to pay the very next day, every day, after work was performed. There were no intervening events which might have caused Piening to deviate from her stated intention. Time was of the essence to Piening. Her business had been shut down and she needed the code violations corrected promptly so she could reopen the hotel. She was looking for a quick fix as to the code violations, but intended to defer payments to "little" creditors until her business was back up and running.

9

Alaska Electric justifiably relied on Piening's representations. It commenced work promptly, as required under the contract, and as a proximate result it sustained damages. Its damages total $6,066.48 for the three unpaid invoices. Alaska Electric also seeks an award of interest, costs and attorney's fees.[26] In a nondischargeability action, an award of prejudgment interest is governed by state law.[27] Under Alaska law, "in contract cases, prejudgment interest runs from the date the claim accrues, unless that would result in an injustice."[28] Here, absent an award of prejudgment interest, Alaska Electric would not be adequately compensated for its loss. Prejudgment interest will be awarded at the legal rate of 10.5% provided in AS 45.45.010(a).[29] Interest will accrue from January 21, 2008, which is the date on which Alaska Electric's final invoice was sent and on which Piening wrote the check to Alaska Electric which bounced, until the date judgment is entered. Post-judgment interest will accrue at the federal judgment rate provided for under 28 U.S.C. § 1961(a).

---

[26] First Am. Compl., filed Oct. 9, 2009 (Docket No. 8), at 5.

[27] *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1463 (9th Cir. 1997).

[28] *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 724 (Alaska 2003); *see also Alderman v. Iditarod Prop., Inc.*, 104 P.3d 136, 145 (Alaska 2004)..

[29] The rate provided by the contract was 1.5% per month or the maximum allowed by law. A monthly rate of 1.5% is equivalent to an annual interest rate of 18%. This rate exceeds the maximum rate allowed under AS 45.45.010(b), which does not allow interest in an agreement to exceed five percentage points above the annual rate charged member banks for advances by the 12th Federal District Reserve on the day on which the contract was made. On January 15, 2008, when Piening and Alaska Electric entered their contract, the applicable annual rate was 4.24%. *See* Federal Reserve Statistical Release - Selected Interest Rates, Release Date: January 22, 2008, http://www.federalreserve.gov/releases/h15/20080122/. Adding five percentage points to this rate yields 9.24%. Because the interest rate charged by Alaska Electric exceeded this rate, it is instead allowed the alternative provided under the contract – the maximum rate allowed by law, which is 10.5%.

10

Alaska Electric is also entitled to attorney's fees as provided under its contract,[30] and its costs of suit.[31]

Conclusion

The defendant made a fraudulent representation that damaged the plaintiff. Alaska Electric's debt will be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). An interlocutory order will be entered consistent with this memorandum decision. A final judgment will be entered after the amount of attorney's fees has been determined.

Dated: November 8, 2010.

BY THE COURT

/s/Donald MacDonald IV
Donald MacDonald IV
United States Bankruptcy Judge

Serve:   G. Watts, Esq. (for plaintiff)
         G. Oczkus, Esq. (for defendant)

11/08/10

---

[30] *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007).

[31] 28 U.S.C. § 1920.